UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| AARON L. SCHNITZLER, | \* | CIV. 06-4064 |
| Plaintiff, | \* | |
| vs. | \* | |
| | \* | REPORT and RECOMMENDATION |
| TIM REISCH, Cabinet Secretary, SD Department of Corrections; BOB DOOLEY, Warden, Mike Durfee State Prison; MIKE STORGAARD, STOP Treatment Director, Mike Durfee State Prison, | \* | (Defendants' Motion for Summary Judgment; Plaintiff's Motion to Dismiss) |
| Defendants. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending are Defendants' Motion for Summary Judgment (Doc. 25) and Plaintiff's Motion to Dismiss. Plaintiff's Complaint was filed in April, 2006. The Court ordered service on the Defendants in May, 2006. Plaintiff amended his Complaint in July, 2006. All Defendants have now moved for summary judgment. Plaintiff resists the Defendants' motion for summary judgment, and in his "motion to dismiss" (Doc. 44) requests injunctive relief exempting him from the South Dakota Department of Corrections STOP program.

## BACKGROUND

Plaintiff, Aaron Schnitzler, is an inmate at the Mike Durfee State Penitentiary in Springfield, South Dakota. He filed this lawsuit pursuant to 42 U.S.C. § 1983[1], alleging he has refused to participate in the South Dakota Department of Corrections STOP (sex offenders) program. He sues Tim Reisch, Secretary of the South Dakota Department of Corrections, Bob Dooley, Warden of the Mike Durfee Penitentiary, and Mike Storgaard, a STOP Treatment Director in their individual and official capacities. Schnitzler alleges the STOP program violates his religious beliefs by requiring

---

[1] Mr. Schnitzler did not cite § 1983 as the basis for his claims, but his claims were submitted on a form commonly used by inmates and provided to them by the penitentiary for civil rights complaints.

his participation in explicit group discussions of a sexual nature . Because he has refused to participate in the program, he has been deemed "non-complaint" with is individual program directive ("IPD"). His request for an alternative program has been denied. Plaintiff's Complaint requests that he either: (1) be allowed to participate in a modified STOP program which does not offend his religious beliefs; (2) be exempted from the STOP program; or (3) be placed in compliance with his IPD.[2] Schnitzler does not request monetary damages.

## JURISDICTION

Plaintiff's Complaint challenges the conditions of his confinement. The pending motions were referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated November 29, 2006.

## UNDISPUTED FACTS

Plaintiff Aaron Schnitzler is an inmate in the custody of the South Dakota Department of Corrections. Schnitzler has been incarcerated since February 18, 2000; he is currently housed at the Mike Durfee State Prison in Springfield. Schnitzler was convicted of[3] sexual contact with a child under the age of sixteen in violation of SDCL § 22-22-7, and was sentenced by the Honorable Jerome A. Eckrich III to a term of imprisonment of fifteen years. (Dooley Aff. ¶ 2). Schnitzler is a practicing Jehovah's Witness. Tim Reisch is the Secretary of the South Dakota Department of Corrections, and has held that position since before January 7, 2003. (Reisch Aff. ¶ 1). Bob Dooley is Warden of the Mike Durfee State Prison, and has held that position during Schnitzler's incarceration. (Dooley Aff. ¶ 1). Mike Storgaard is a therapist for the sex offender treatment program for the South Dakota Department of Corrections, called STOP, which stands for Special Treatment of Perpetrators. Storgaard, who works at the Durfee State Prison, has held that position since 1998. (Storgaard Aff. ¶ 1).

---

[2]In his "Opposing Party's Required Statement of Facts" (Doc. 37) Schnitzler explains in Fact Nos. 24-26 that although he would like the chance to get parole, his claim is not *about* parole. Because Plaintiff's participation in the STOP program is mandatory in order to be compliant with his IPD, and compliance with his IPD is required for non-discretionary parole, the issues are inextricably intertwined. The Court received a letter from Schnitzler dated February 11, 2007 in which Mr. Schnitzler stated he remained complaint with every other aspect of his IPD, and because of his non-compliance with the STOP portion his case would be subject to the discretion of the parole board at a hearing on February 21, 2007. See Doc. 47.

[3]The Defendants' statement of undisputed material facts asserts Schnitzler pleaded guilty. Schnitzler asserts he pleaded no contest.

Because Schnitzler was convicted of a sex offense, he was identified at the outset of his incarceration as needing sex offender treatment. His IPD dated March 12, 2000, indicated that he needed to "participate as directed in the STOP program and cooperate fully with all conditions of the program." (Storgaard Aff. Ex. A). The DOC makes treatment available to inmates beginning two years before the inmate is first eligible for parole. (*Id.* ¶ 3). Schnitzler was first offered sex offender treatment in early 2002. (*Id.* ¶ 4). When Schnitzler was first offered treatment, the program was approximately two years long, and then involved ongoing follow-up therapy. Currently, the program takes between eighteen to twenty-four months to complete. (*Id.*). The program is more fully described in Defendants' responses to Plaintiff's Request for Production of Documents, which are attached to Defendants' Statement of Undisputed Material Facts (Doc. 30) as Exhibit A. The program does include explicit discussion of sexual matters (including pornography, sexual intercourse, rape, sexual fantasies, and methods of victim "grooming") in a group setting. See Defendants' Responses to Plaintiff's Request for Production of Documents No. 2, Ex. A.

On January 11, 2002, Schnitzler refused to participate in the STOP program for religious reasons, and signed a form indicating his refusal to participate. (Storgaard Aff. ¶ 5). In his response to the Defendant's Statement of Undisputed Material Facts (No. 11), Schnitzler asserts the STOP program violates the religious principles espoused by his (Jehovah's Witness) faith. Specifically, Mr. Schnitzler repeatedly quotes Ephesians 5:3-4[4] and Philippians 4:8 in support of his assertion that graphic group discussions of a sexual nature are contrary to his religious beliefs. Schnitzler cited these same scriptures and other religious authority, including excerpts from the Jehovah's Witness publications *Awake!* and *The Watchtower* to Defendant Reisch (Reisch Aff. Ex. A --*Awake!* December 8, 2003, April 8, 2004, *Watchtower* October 15, 2003, February 15, 2004, ) and Warden Dooley (Dooley Aff. Exs. A-C-- *The Watchtower,* February 15, 2005). Mr. Schnitzler also attached copies of scriptures and religious authority to his Brief in Opposition to Defendants' Motion for Summary Judgment as Exs. A, (Ephesians, Philippians), B (*Awake!* October 8, 2005*)* C &D (*The Watchtower,* February 15, 2005, July 15, 2006*).*

---

[4]Ephesians 5:3-4 states: Let fornication and uncleanness of every sort or greediness not even be mentioned among you, just as it befits holy people; neither shameful conduct nor foolish talking nor obscene jesting, things which are not becoming, but rather the giving of thanks. See Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, Ex. A.

3

Each periodic review of Schnitzler's IPD after January 11, 2002, indicated that he was non-compliant with the directive that he participate in treatment. (Storgaard Aff. ¶ 5). Additionally, since November, 2004, Schnitzler has been compliant with every other element of his IPD. (Storgaard Aff. Ex. C). On May 31, 2005, Schnitzler filed an informal resolution request in which he requested an alternative to the STOP program for religious reasons. (Attached to Defendants' Statement of Undisputed Material Facts as Exhibit B). Schnitzler's request indicated his religion precluded him from participating in group treatment involving graphic discussions of sex offenses. The response indicated that Mike Storgaard was willing to discuss the issue with Schnitzler, and that the Department of Corrections did not intend to violate or change anyone's religion through participation in the program. (*Id.*).

On June 3, 2005, Schnitzler filed a request for administrative remedy in which he indicated his wish to be compliant, but expressed his belief that "[t]he STOP program is based on self-examination, and a search for answers that are outside of my relationship with Jehovah." (Dooley Aff. ¶ 3). He asked for an alternative to the program that did not violate his religious beliefs. (*Id.*). On June 15, 2005, Warden Dooley responded to the request by indicating that no alternate programs were planned, that STOP was the only current program offered for sex offenders, and that Schnitzler would remain noncompliant unless he participated in treatment. (*Id.* ¶ 4).

On June 30, 2005, Schnitzler wrote to Secretary Reisch about his refusal to participate in the STOP program, asked that he be considered compliant with his IPD, and indicated his willingness to participate in alternative treatment. (Reisch Aff. ¶ 2). Secretary Reisch responded on July 7, 2005, and indicated that he would not intercede by excusing Schnitzler from participation in the STOP program. (*Id.* ¶ 3). Reisch wrote that he wanted "to do everything I can to reduce the chances of people recidivating," and that "[t]he STOP program is necessary to help certain inmates improve their chances of staying crime-free upon their release." (*Id.*). Schnitzler again wrote to Reisch on July 13, 2005, and argued that he was willing to participate in treatment, but that he would "not listen to detailed accounts of what other people in the group may or may not have done to their victims. This includes any written or recorded accounts of the victims, or the offenders, sexually descriptive abuse." (*Id.* ¶ 4).

On August 5, 2005, Storgaard talked to Schnitzler after he had discussed Schnitzler's situation with Kris Petersen, the director of the sex-offender treatment program for the Department

4

of Corrections. (Storgaard Aff. ¶ 6; Petersen Aff. ¶¶ 3-5). Storgaard told Schnitzler that he needed to participate in the program, and that the recidivism rate for those who did not participate in group therapy was sixty percent. (Storgaard Aff. ¶6). On August 9, 2005, Secretary Reisch responded to Schnitzler's letter dated July 13, 2005, and reiterated that he needed to participate in the STOP program. (Reisch Aff. ¶ 5). Schnitzler submitted a project application dated February 13, 2006, in which he again asked for an alternate program for sex-offender treatment. (Dooley Aff.¶ 5). Schnitzler's proposed alternative would not include "sexually explicit worksheets, handouts, videos, or specific written and/or recorded accounts of victims, and offenders sexually descriptive abuse." (*Id.*). Warden Dooley denied the project application on March 16, 2006. (*Id.*).

Storgaard and Peterson have opined that an essential aspect of the STOP program is group therapy. They have also opined that Schnitzler's proposed alternative, in which group therapy would not be involved, would be ineffective treatment, i.e., it would be unlikely to prevent recidivism. (Storgaard Aff. ¶ 7;Petersen Aff. ¶ 6).

All inmates convicted of a sex offense are identified as needing sex offender treatment without regard to their religion. (Peterson Aff. ¶ 7). Schnitzler has not been forced to participate in sex offender treatment. (Storgaard Aff. ¶ 8). Schnitzler has not been forced to do anything contrary to his religious beliefs. (*Id.*). He has consistently asserted, however, that compliance with his IPD requires participation in the STOP program, and the STOP program in its current form requires group discussions which would be contrary to his religious beliefs. (Complaint, Reisch Aff. Ex. A, Dooley Aff. Ex. A-C, Plaintiff's Response to Defendants' Statement of Undisputed Material Facts, Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment Exs. A-D).

Schnitzler was first eligible for parole on February 19, 2007. (Reisch Aff. ¶10). An inmate who has substantively met the requirements of the IPD established by the Department of Corrections, who has agreed to the conditions of his supervision, and who has an approved parole-release plan, shall be released from incarceration to parole supervision without a hearing with the parole board at the time of the inmate's initial parole date. SDCL § 24-15A-38. The warden must report to the parole board at least thirty days before an inmate's initial parole date of the inmate's substantive compliance or noncompliance with the inmate's IPD. SDCL § 24-15A-35. An inmate whom the warden reports has not substantively complied with the IPD shall have a hearing with the board to determine whether the inmate has complied with the inmate's IPD. The board may determine that

5

the inmate has complied and release the inmate at the inmate's initial parole date, or may determine that the inmate has not substantively met the requirements of the IPD, and deny release at the initial parole date. A finding of noncompliance is appealable under SDCL Ch. 1-26. Inmates who are not released on their initial parole date must receive a discretionary parole hearing at least every two years. SDCL § 24-15A-39.

## DISCUSSION

### Summary Judgment Standard

"Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Clark v. Kellog Co., 205 F.3d 1079, 1082 (8th Cir. 2000); Fed. R. Civ. P. 56(c). To avoid summary judgment, the non-moving party must "show that admissible evidence will be available at trial to establish a genuine issue of material fact." Churchill Business Credit, Inc. v. Pacific Mutual Door Co., 49 F.3d 1334, 1337 (8th Cir. 1995). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and by affidavit or otherwise designate specific facts showing that there is a genuine issue for trial." Commercial Union Ins. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992) (internal quotation marks and citations omitted). "Summary judgment is an extreme remedy, to be granted only when no genuine issue exists as to any material fact." Moore v. Jackson, 123 F.3d 1082, 1086 (8th Cir. 1997).

While prisoners are entitled to the benefit of liberal construction of their pleadings because of their pro se status, Fed. R. Civ. P. 56 remains applicable to them. Quam v. Minnehaha County Jail, 821 F.2d 522 (8th Cir. 1987). Courts must remain sensitive, however, to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and the Eighth Circuit has explicitly disapproved of summary dismissal of prisoner pro se claims without regard for these special problems. Nickens v. White, 622 F.2d 967, 971 (8th Cir. 1980) cert. den. 449 U.S. 1018, 101 S.Ct. 581, 66 L.Ed.2d 478 (1980). "When dealing with summary judgment procedures the technical rigor is inappropriate where . . . uninformed prisoners are involved." Ross v. Franzen, 777 F.2d 1216, 1219 (7th Cir. 1985). [5]

---

[5]Plaintiff is proceeding without the benefit of counsel. Mr. Schnitzler submitted a brief opposing Defendants' Motion for Summary Judgment, and responded to Defendants' Statement

6

**Ripeness**

Defendants assert Mr. Schnitzler's claims should be dismissed because they are not ripe for adjudication. "The ripeness doctrine is grounded in both the jurisdictional limits of Article III of the Constitution and policy considerations of effective court administration." KCCP Trust v. The City of North Kansas City, 432 F.3d 897, 899 (8th Cir. 2005) (citation omitted). Article III limits federal courts to deciding "cases and controversies." Id. A claim is not "ripe" for adjudication if it "rests upon contingent future events that may or may not occur as anticipated or indeed may not occur at all." Id. However, a plaintiff need not "await consumption of a threatened injury;" an action is ripe for adjudication if the plaintiff faces an injury that is "certainly impending." South Dakota Mining Association v. Lawrence County, 155 F.3d 1005, 1008 (8th Cir. 1998). Jurisdictional issues such as ripeness and standing must be determined at the time the lawsuit is filed. Sierra Club v. United States Army Corps of Engineers, 446 F.3d 808, 814 (8th Cir. 2006).

In this case, Schnitzler complains that to be compliant with his IPD (which he must be in order to be automatically eligible for parole pursuant to South Dakota law) he must participate in a program which he asserts violates his religious beliefs. He has consistently refused to participate in the program since January, 2002, and has consistently been deemed non-compliant with his IPD based on the refusal. The program takes between eighteen and twenty-four months to complete. He is otherwise completely compliant with his IPD according to the documentation provided by Defendants. Had Schnitzler participated in the STOP program, he would have been entitled to automatic parole on February 19, 2007--without a hearing and not subject to the discretion of the parole board--conditioned only on his agreement to the terms of supervision and an approved parole release plan, pursuant to SDCL § 24-15A-38. Because of his non-compliant status, his parole is subject to the discretion of the parole board pursuant to SDCL § 24-15A-39.

This case is unlike Peck v. Battey, 721 F.2d 1157 (8th Cir. 1983). There, the inmate

---

of Undisputed Facts, paragraph by paragraph as required by the Local Rules. Mr. Schnitzler's disagreement with Defendants' Statement of Undisputed Facts is often supported by his reference to Exhibits attached to his Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 38). That those exhibits are not attached to an Affidavit by Mr. Schnitzler identifying them is not fatal to his resistance to the summary judgment motion, in light of his pro se status and the ease with which this "technical" error could be corrected. This is especially true in this case, where the exhibits to Mr. Schnitzler's brief (copies of scriptures, and the Jehovah's Witness religious authorities *Awake!* and *The Watchtower* have been made well- known to the Defendants by the Plaintiff for several years.

7

challenged the application of the South Dakota parole policy before he was eligible for parole. In this case, Mr. Schnitzler filed his lawsuit in April, 2006. By then, he had been deemed "non-compliant" with his IPD at least three times based solely on his refusal to participate in STOP. In order to earn parole without being subjected to the discretion of the parole board pursuant to SDCL 24-15A-38, Schnitzler would have had to begin the STOP program at least eighteen months in advance of his parole eligibility date (February 19, 2007)--or August 19, 2005. For that reason, this case is also unlike Castaneira v. Bloomberg, Civ. 01-04026. There, Mr. Castaneira protested the fact that *when* he served his suspended sentence he would be required to agree to conditions of supervision imposed by the Board of Pardons and Paroles (whom he argued had no power to impose conditions) and *if* he refused to agree to the conditions, his suspended sentence could be revoked. Castaneira's suspended sentence had not yet begun, and the Board had not yet imposed any conditions. Here, the condition (the STOP program) has already been imposed, Schnitzler has already been deemed "non-compliant," and has already lost his opportunity for parole without a hearing. The date for which he would have been eligible for parole *without a hearing* was February 19, 2007. When he filed his lawsuit in April, 2006, he had lost his chance to be compliant with his IPD by completing the STOP program by his parole eligibility date. Schnitzler need not "await consumption of a threatened injury;" an action is ripe for adjudication if the plaintiff faces an injury that is "certainly impending." South Dakota Mining Association v. Lawrence County, 155 F.3d 1005, 1008 (8th Cir. 1998). Schnitzler's claim is ripe for determination.

Defendants likewise assert Schnitzler has no standing because he has failed to establish actual or imminent harm. Defendants' assertion that Schnitzler can prove no injury because he has no liberty interest in parole is unpersuasive. Defendants have cited no controlling precedent which holds South Dakota's "new" parole statute (SDCL § 24-15A-38) does not create a liberty interest in parole. Judge Piersol has recognized the "new" parole statute may create a liberty interest in parole. See Christensen v. Weber, Civ. 00-4136. The Eighth Circuit found South Dakota's "old" parole system created no liberty interest in parole because the parole Board retained discretion to deny parole. Dace v. Mickelson, 816 F.2d 1277, 1280 (8th Cir. 1987). "[F]or a state to create a protectible liberty interest the statute or regulation must *require* release upon satisfaction of the substantive criteria listed. Such a directive may be found where the state uses language of a mandatory character, such as 'shall,' 'will,' or 'must.'" Id. The South Dakota Supreme Court has had

8

occasion to contrast the "old" and "new" parole systems, and noted parole was discretionary under the old system, but "[i]n contrast under the new system, SDCL 24-15A-38 allows the Board no discretion: inmates *shall* be granted parole if their program directives have been met." Bergee v. South Dakota Board of Pardons and Paroles, 608 N.W.2d 636, 643 (S.D. 2000). In other words, if Plaintiff had participated in the STOP program, his release on parole would be mandatory without Board discretion. The Missouri parole system, cited by the Defendants in Jones v. Moore, 996 F.2d 943 (8th Cir. 1993) is subject to Board discretion (V.A.M.S. § 217.690) and unlike South Dakota law, "the regulations do not *entitle* a prisoner to release simply because the prisoner completes the [sex offender treatment] program . . ." See Wheat v. Missouri Board of Probation and Parole, 932 S.W.2d 835, 839 (Mo. App. W.D. 1996) (emphasis added). Schnitzler's claim should not be dismissed based on a lack of standing.

### Defendant Dooley and Reisch's Personal Involvement

Defendants correctly note that public officials cannot be held liable for claims brought under § 1983 on a theory of *respondeat superior.* Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993); Cooper v. Schirro, 189 F.3d 781, 784 (8th Cir. 1999). A warden or prison director who lacks medical expertise cannot be held responsible for a an alleged constitutional wrong based on the diagnostic judgment of a physician. Crooks v. Nix, 872 F.2d 800, 803-04 (8th Cir.1989). A § 1983 claimant may maintain a theory of direct liability against a supervisory official if he fails to train, supervise, direct or control the actions of subordinates who cause a constitutional injury. Id. A warden may, however, be liable for his own personal involvement. White v. Farrier, 849 F.2d 322, 327 (8th Cir. 1988) (although warden's receipt of memos and grievances demanding medical treatment did not in and of itself establish warden's knowledge that prisoner had serious medical need, the level of warden's personal involvement in medical staff's decision that no medical need existed was a question of fact to be determined at trial). The warden may also be liable for his policy decisions regarding the allegedly unconstitutional prison conditions. Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985); Outz v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987).

Robert Dooley is the Warden of Mike Durfee State Prison and has held that position throughout Schnitzler's incarceration. Schnitzler requested an administrative remedy in June, 2005, explaining he wished to be compliant with his IPD, but believed the STOP program was contrary to his religious beliefs. Schnitzler requested an alternative treatment program which did not violate

his religious beliefs. Warden Dooley reviewed Schnitzler's administrative remedy request, and denied his request for an alternative program. In February, 2006, Schnitzler submitted a project application to Warden Dooley. Schnitzler proposed an alternative program to the STOP treatment, which he (Schnitzler) believed would not violate his religious beliefs. Dooley denied the application. In his affidavit, Dooley cited his reliance on the "judgment, training and experience of the professionals who have designed and implemented the sex-offender treatment program . . . " and that fact that he "do[es] not have the authority to exempt from treatment anyone determined to need treatment" as justification for his refusal to approve Schnitzler's request for an alternative sex offender treatment program.

Tim Reisch is the Secretary of the South Dakota Department of Corrections and has held that position since January, 2003. Schnitzler corresponded with Reisch in June, 2005. Schnitzler explained his religious objections to the STOP program, his desire to be compliant with his IPD, and his request for an alternative sex-offender treatment program. Reisch responded in writing and indicated he would not intercede, and would not excuse Schnitzler's participation in the STOP program. Schnitzler wrote to Reisch again in July, 2005, again requesting a modified version of STOP which would not violate Schnitzler's religious beliefs. Reisch responded to Schnitzler in writing, and again declined to intervene on Schnitzler's behalf. In his August, 2005 letter to Schnitzler, Reisch stated, "until you complete the STOP Program, you will remain non-compliant wit this portion of your Individual Program Directive (IPD)." In his affidavit, Reisch explains "based on the advice of those trained to implement and administer the DOC's sex-offender treatment program, I did not think it was in the interest of either Schnitzler or the public for him to be excused from treatment," and "I think that exempting offenders from treatment based on their subjective interpretations that treatment is contrary to their religious principles would undermine the State's ability to rehabilitate sex offenders."

The evidence in the record from individuals whom have implemented the STOP program at the DOC comes from the affidavits of Kris Peterson and Mike Storgaard. Peterson is the STOP program manager; Storgaard is a STOP therapist. Peterson explained he discussed Schnitzler's request for alternative treatment with Storgaard and other STOP personnel, and agreed Schnitzler should not be exempted from the program, nor should an alternative program be created for him. As justification for the decision, Kris Peterson stated, "[i]n my experience, group therapy is an

essential element of successful sex-offender treatment. I did not think that the sort of individualized alternative that Schnitzler was proposing would be effective." In his affidavit, Storgaard stated that "group therapy is an essential element of the STOP program and of successful sex-offender treatment. I do not think the sort of individualized program proposed by Schnitzler would be effective, and he would be far more likely to reoffend than if he completed the STOP program."

In this case, Schnitzler did not request total exemption from the STOP program. Instead, he requested a modified program which would not conflict with his religious beliefs. Both Dooley and Reisch did more than review Schnitzler's lower level grievances. Schnitzler provided them with detailed information regarding his request and asked them to make an exception to the standard STOP program policy to accommodate his religious beliefs. Both refused.[6] Schnitzler has shown that Reisch and Dooley's involvement in the decision was based on more than a *respondeat superior* basis. There is a genuine issue of material fact to be determined at trial regarding the level of Dooley and Reisch's personal involvement in the determination that no alternative form of STOP treatment should be provided to Schnitzler. White v. Farrier, 849 F.2d 322, 327 (8th Cir. 1988). Dooley and Reisch also made policy decisions regarding Schnitzler's request. Both decided no exceptions should be made to the general rule that every inmate deemed in need of sex offender treatment should participate in the same form of the STOP program, regardless of their religious beliefs. Reisch explained "exempting offenders from treatment based on their subjective interpretations that treatment is contrary to their religious principles would undermine the State's ability to rehabilitate sex offenders." Reisch Aff. ¶ 8. If that policy is unconstitutional, they may be liable for their policy decisions Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985); Outz v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987). Reisch and Dooley are not entitled to summary judgment based on their lack of personal involvement.

**Plaintiff's Constitutional and Statutory Free Exercise Claims**

Liberally construed, Schnitzler raises two claims in this § 1983 action: a constitutional free exercise of religion claim under the First Amendment and a statutory free exercise claim under

---

[6]The affidavits of Dooley, Reisch, Storgaard, and Peterson do not indicate whether or to what extent Dooley or Reisch actually discussed Schnitzler's request for a modified treatment program with Storgaard or Peterson before they denied it.

11

RLUIPA, 42 U.S.C. § 2000cc-1.[7] The two claims are reviewed under different standards. Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 983 (8th Cir. 2004). Schnitzler's First Amendment claim is subject to a rational relationship test which requires the state to show the regulation has a reasonable relationship to a legitimate penological interest. His RLUIPA claim mandates a "more searching standard" of review: strict scrutiny which requires the state to show the regulation is the least restrictive means to further a compelling interest. Murphy, 372 F.3d 982, 988, Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006).

### 1.    First Amendment Free Exercise Claim

The initial inquiry under either the constitutional or statutory analysis is whether the governmental policy or action (in this case Schnitzler's required participation in the unmodified STOP program in order to be eligible for mandatory parole) "substantially burdens his sincerely held religious belief." Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997).[8] The Eighth Circuit has recently defined a "substantial burden" as government action which: (1) significantly inhibits or constrains conduct or expression that manifests some central tenet of a person's individual religious beliefs; (2) meaningfully curtails the ability to adhere to his or her faith; or (3) denies reasonable opportunities

---

[7]In his summary judgment brief, Schnitzler mistakenly referred to the statute as RFRA. See Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, P.5. That Act, however, was declared unconstitutional in 1997 by City of Boerne v. Flores, 521 U.S. 507 117 S.Ct. 2157, 138 L.Ed.624 (1997). Congress passed a new statute (RLUIPA) in 2000.

> Congress enacted RLUIPA in response to the Supreme Court's holding in City of Boerne v. Flores . . . ,declaring unconstitutional the Religious Freedom Restoration Act . . .RLUIPA applies both to substantial burdens imposed by programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce.
> ***
> Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion on whether the regulation substantially burdens the plaintiff's exercise of religion and the state bears the burden of persuasion on all other elements. 42 U.S.C. § 2000cc-2(b).

Cancel v. Mazzuca, 2003 WL 1702011 (S.D.N.Y. March 28, 2003). RLUIPA became effective on September 22, 2000. The United States Supreme Court affirmed the constitutionality of RLUIPA in Cutter v. Wilkinson, 544 U.S. 709, 125 S.Ct. 2113 (2005).

[8]The Defendants do not question the sincerity of Schnitzler's claim to be a practicing Jehovah's Witness.

to engage in those activities that are fundamental to his or her religion. Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997). Likewise, to condition the availability of benefits on the willingness to violate a cardinal principle of one's religious faith effectively penalizes the free exercise of religion. Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963). See also Love v. Reed, 216 F.3d 682, 689-90 (8th Cir. 2000) (Arkansas Corrections System substantially burdened inmate's ability to freely exercise his religion because his choice between fasting on weekends and compromising his religions convictions "is really no choice at all. . . .The ADC's failure to provide the requested accommodation, then, substantially burden's Love's ability to freely exercise his religion.").

Schnitzler has consistently asserted his participation in the unmodified STOP program would violate his Jehovah's Witness beliefs. See Complaint, Dooley Aff. Exs. A-C, Reisch Exs. A-D.[9] His assertion is based on his interpretation of certain scriptures and passages from religious authority. In support of their assertion that participation in the STOP does not substantially burden the exercise of Schnitzler's religion, Defendants submitted Kris Peterson's affidavit, in which he explains that he "talked to Randy Lahammer, a Jehovah's Witness who volunteers at the South Dakota State Penitentiary . . ." Peterson avers that Mr. Lahammer said he did not "know of any reason why participation in sex-offender treatment involving group therapy would violate the religious principles of a Jehovah's Witness." An affidavit which contains an out-of-court statement offered to prove the truth of the matter asserted may not be used to support or defeat a motion for summary judgment. Brooks v. Tri-Systems, Inc., 425 F.3d 1109, 1111 (8th Cir. 2005). Portions of affidavits containing inadmissible hearsay are disregarded for purposes of a summary judgment motion. Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 982 (8th Cir. 2004). That portion of Kris Peterson's affidavit in which he refers to Mr. Lahammer's opinion has not been considered. The only evidence on the record, therefore, is Schnitzler's assertion that his participation in the currently offered form of the STOP program would violate his religious beliefs. Schnitzler must choose, therefore, between abandoning his religious beliefs to participate in the STOP program so as to be compliant with his IPD and gain the benefit of non-discretionary parole or follow his

---

[9] Love supports the conclusion that even assuming Schnitzler's beliefs are not tenets of the Jehovah's Witness religion, his beliefs are rooted in religion, as opposed to purely secular beliefs or personal preferences. Love, 216 F.3d 682, 685-690, particularly at 687.

13

religious beliefs and forfeit the benefit of discretionary parole. This choice "is really no choice at all." Love v. Reed, 216 F.3d at 689. On this record, Schnitzler has shown his ability to freely exercise his religion has been substantially burdened.

Once it is established that Schnitzler's ability to exercise his religion has been substantially burdened, "constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting." Turner v. Safley, 482 U.S. 78, 81, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The rule is valid if it is reasonably related to a legitimate penological interest. This less restrictive approach ensures the ability of prison officials to "adopt innovative solutions to the intractable problems of prison administration . . . and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to 'resolution by decree.'" Id. 482 U.S. at 349, 107 S.Ct. at 2404. To decide whether a prison rule is reasonably related to a legitimate penological interest, four factors are considered: (1) whether there is a valid, rational connection between the prison regulation and the government interest justifying it; (2) whether there is an alternative means available to prison inmates to exercise the right; (3) whether an accommodation would have a significant ripple effect on the guards, other inmates, and prison resources; and (4) whether there is an alternative that fully accommodates the prisoner at de minimis cost to valid penological interests. Id., 482 U.S. at 90-91, 107 S.Ct. at 2254.

The South Dakota DOC's current policy is that all inmates convicted of sex offenses are identified as needing sex offender treatment. The United States Supreme Court has instructed that the State has an "undeniable" and "vital" interest in the rehabilitation of sex offenders. McKune v. Lile, 536 U.S. 24, 33, 48, 122 S.Ct. 2017, 2032, 153 L.Ed.2d (2002).

> Sex offenders are a serious threat in this Nation. In 1995, an estimated 355,000 rapes and sexual assaults occurred nationwide. U.S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders 1 (1997) (hereinafter Sex Offenses); U.S. Dept. of Justice, Federal Bureau of investigation, Crime in the United States, 1999, Uniform Crime Reports 24 (2000). Between 1980 and 1994, the population of imprisoned sex offenders increased at a faster rate than for any other category of violent crime. *See* Sex Offenses 18. As in the present case, the victims of sexual assault are most often juveniles. In 1995, for instance, a majority of reported forcible sexual offenses were committed against persons under 18 years of age. University of New Hampshire, Crimes Against Children Research Center, Fact Sheet 5; Sex Offenses 24. Nearly 4 in 10 imprisoned violent sex offenders said their victims were 12 or younger. *Id.*, at iii.

> When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault. *See id.*, at 27; U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997). States thus have a vital interest in rehabilitating convicted sex offenders.
>
> Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism. *See* U.S. Dept. of Justice, Nat. Institute of Corrections, A Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii (1988) ('[T]he rate of recidivism of treated sex offenders is fairly consistently estimated to be around 15%,' whereas the rate of recidivism of untreated offenders has been estimated to be as high as 80%.
>
> 'Even if both of these figures are exaggerated, there would still be a significant difference between treated and untreated individuals'). An important component of those rehabilitation programs requires participants to confront their past and accept responsibility for their misconduct. *Id.*, at 73. "Denial is generally regarded as a main impediment to successful therapy," and "[t]herapists depend on offenders' truthful descriptions of events leading to past offences in order to determine which behaviours need to be targeted in therapy." H. Barbaree, Denial and Minimization Among Sex Offenders: Assessment and Treatment Outcome, 3 Forum on Corrections Research, No. 4, p. 30 (1991). Research indicates that offenders who deny all allegations of sexual abuse are three times more likely to fail in treatment than those who admit even partial complicity. *See* B. Maletzky & K. McGovern, Treating the Sexual Offender 253-255 (1991).[10]

McKune, Id. at 32-33. There is, therefore, a valid, rational connection between the South Dakota DOC requirement that all convicted sex offenders participate in the sex offender treatment program and the State's interest in preventing recidivism.

The next inquiry is whether Schnitzler has an alternative means to exercise his Jehovah's Witness religion. Schnitzler has not claimed the DOC's policy has prevented him from practicing any facet of his Jehovah's Witness religion. Instead, he asserts he must choose between adhering to his religious beliefs and complying with his IPD.[11] On the current record, Schnitzler's alternatives

---

[10]Schnitzler does not deny the allegations of sexual abuse for which he was convicted. See Reisch Aff. Ex. A, Plaintiff's Statement of Material Facts (Doc. 37) No. 21. Schnitzler also does not object to participation in group therapy per se. Rather, he objects to what he refers to as "therapeutic pornography." Id. Fact No. 20.

[11]In McKune, the United States Supreme Court noted that the central question in the case was whether "the State's program, and the consequences for nonparticipation in it, combine to create a compulsion that encumbers the constitutional right." McKune, 536 U.S. at 35, 122 S.Ct.

15

are to participate in the unmodified STOP program which he claims would require him to violate his religious beliefs, or to adhere to his religious beliefs, remain non-compliant with his IPD, and consequently forfeit his non-discretionary parole eligibility.

The third factor and fourth factors are related: whether an accommodation would have a "significant ripple effect" on the guards, other inmates, and prison resources and whether there is an alternative that fully accommodates the prisoner at *de minimis* cost to valid penological interests. "This is not a 'least restrictive alternative' test, prison officials do not have to set up and shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Turner v. Safley, 482 U.S. 78, 90-91, 107 S.Ct. 2254, 2262. But if the inmate can point to an alternative that fully accommodates his rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship test. Id.

There is relatively little evidence in the record regarding these two factors. Schnitzler proposed an accommodation in the form of a modified STOP program in which he would "openly confess" to his crime and complete "to the satisfaction of the STOP treatment facilitator all worksheets and exercises relevant to the sex offender treatment" but "so as not to violate his religious convictions sexually explicit worksheets, handouts videos or specific written or recorded accounts of victims and offenders sexually descriptive abuse will not be a part of the curriculum . . . this program could include one-on-one sessions with a STOP treatment facilitator . . . This special program would also allow the DOC to fulfill its mission to protect the public from a sex-offender recidivating. (All that is being asked is that the DOC make an exception because of my strong religious faith.) See Project Application, Dooley Aff. (Doc. 27) Ex. A. Schnitzler also explains in his Reply Brief In Opposition to Defendants' Motion for Summary Judgment (Doc. 42) that regarding his proposed alternative program, "nothing I have asked for is burdensome to the

---

at 2025. The constitutional right at issue in McKune was the Fifth Amendment right against self-incrimination. Important to the Court's decision was that the consequences for nonparticipation in the program did not extend the prisoner's term of incarceration nor affect his eligibility for good-time credits or parole. Id. at 538 U.S., 122 S.Ct. at 2027. See also Bradford v. Missouri Dept. of Corrections, 46 Fed. Appx. 857 (unpublished, copy attached) (remanding for reconsideration by the District Court in light of the "potentially significant" constitutional issues raised by prisoner who refused to participate in sex-offender treatment program on Fifth Amendment grounds and alleged the consequences for his refusal included denial of parole eligibility.

16

Defendants. Exempting me from the program would be easy for the Defendants to do. DOC manual 1.4B-1-4 of 30 says: Each program area can exempt an inmate from completing its program requirements or program electives based on the inmate's capability. To exempt an inmate would be as easy as sending a memo to the Unit Staff (As the DOC manual reads). As for creating a program that I could take, that does not involve pornography, that would be as simple as me doing all the worksheets and even going to the group, but when pornography is discussed I would be excused. . . ." See Doc. 42, p. 3. Storgaard's affidavit states "[b]ased on my training and experience as a therapist treating sex offenders, I think that group therapy is an essential element of the stop program and of successful sex-offender treatment. I do not think that the sort of individualized program proposed by Schnitzler would be effective, and he would be far more likely to reoffend than if he completed the STOP program." Storgaard Aff., Doc. 28, ¶ 7. Kris Peterson's affidavit states, "[i]n my experience, group therapy is an essential element of successful sex-offender treatment. I did not think that the sort of individualized alternative that Schnitzler was proposing would be effective." Peterson Aff., Doc. 26, ¶ 6. Reisch's affidavit states, "[b]ased on my experience with sex offenders and based on the advice of those trained to implement and administer the DOC's sex-offender treatment program, I did not think that it was in the best interest of either Schnitzler or the public for him to be excused from treatment. . . . I think that exempting offenders from treatment based on their subjective interpretations that treatment is contrary to their religious principles would undermine the State's ability to rehabilitate sex offenders." These conclusory statements provide no basis upon which the court can make a determination about whether or to what extent accommodating Schnitzler's request to modify the STOP program to comply with his Jehovah's Witness beliefs would affect the guards, other inmates, or prison resources. Likewise, none of the Defendants have seriously addressed the logistics of Schnitzler's proposed alternative program, or why, given his willingness to admit his guilt, a modified program would be less effective for Schnitzler in preventing recidivism than the standard STOP program.[12]

---

[12]"[The prison officials] documented reason . . . is too conclusory to support a judgment in its favor. . . . We recognize and defer to the expertise of prison officials. . ., but summary judgment would be appropriate only if [the prison officials] presented some specific evidence of why this particular item implicates prison concerns." Murphy at 986.

17

There is a valid, rational connection between the South Dakota DOC requirement that all convicted sex offenders participate in the sex offender treatment program and the State's interest in preventing recidivism. Schnitzler's current alternatives are to participate in the unmodified STOP program which he claims would require him to violate his religious beliefs, or to adhere to his religious beliefs, remain non-compliant with his IPD, and consequently forfeit his non-discretionary parole eligibility. The Defendants have not adequately addressed whether Schnitzler's proposed alternative treatment program would affect the guards, other inmates, or prison resources and have likewise not sufficiently addressed why, given his willingness to admit guilt, his proposed modified program would be less effective for Schnitzler in preventing recidivism than the standard STOP program.[13] A genuine issue of material fact exists, therefore, regarding whether the South Dakota DOC's policy mandating participation in the STOP program, regardless of Schnitzler's objection for religious reasons, is reasonably related to a valid penological interest.

### 2. Statutory Free Exercise Claim: RLUIPA

The Religious Land Use and Institutionalized Persons Act (RLUIPA) is found at 42 U.S.C. § 2000cc et. seq. It provides in part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a).[14] By enacting RLUIPA, Congress established a statutory free exercise

---

[13] In their brief, Defendants correctly assert prison officials should not have to disprove the availability of alternatives, nor "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Defendants' Brief in Support of Motion for Summary Judgment (Doc. 31) p. 12-13. Schnitzler, however, has proposed an alternative method of accommodation which he claims will not affect the State's penological interests. See Project Application "this special program would also allow the DOC to fulfill its mission to protect the public from a sex-offender recidivating." Dooley Aff. (Doc. 24) Ex. C. The Defendants' affidavits offer no specifics about Schnitzler's proposal and really boil down to their generalized opinions that it just won't work.

[14] This section of the Act applies when the substantial burden on religious exercise is imposed in a program or activity that receives Federal financial assistance. The Supreme Court has noted that every State accepts Federal funding for its prisons. Cutter, 544 U.S. at 716, n.2, 125 S.Ct. at 2119 n.2. Defendants acknowledge the DOC received Federal grant money to fund the STOP program. Reisch Aff. (Doc. 29), ¶ 7.

18

claim encompassing a higher standard of review than that which applies to constitutional free exercise claims. Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 986 (8th Cir. 2004). Although RLUIPA requires the State to meet a higher burden than the rational relation test, Courts should nevertheless accord a "significant degree of deference" to the expertise of prison officials in evaluating whether they have met their burden. Id. at 987-88. The prisoner bears the initial burden of showing a substantial burden on his ability to exercise his religion. Id. at 988. The State bears the burden of burden of persuasion to prove that the rule is in furtherance of a compelling governmental interest and that it is the least restrictive means of furthering the interest. See 42 U.S.C. § 2000cc-2(b); Cutter v. Wilkinson, 544 U.S. 709, 714-15, 125 S.Ct. 2113, 2118 (2005).

It has already been decided that on this record, Schnitzler has shown a substantial burden on his ability to exercise his religion.[15] The Defendants bear the burden of proving a compelling interest in preventing recidivism,[16] and that Schnitzler's participation in the currently offered form of the STOP program is the least restrictive means to achieve this goal. "Although we give prison officials wide latitude within which to make appropriate limitations, they must do more than offer conclusory statements and post hoc rationalizations for their conduct." Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 988-89 (8th Cir. 2004). Prison officials must provide "some basis" for their stated concerns that the prisoner's requested accommodation will result in the adverse consequences predicted, and "some evidence" that their decision represents the least restrictive means necessary to preserve the compelling interest. Id. In Murphy, the district court's grant of summary judgment in favor of prison officials was reversed, because the prison officials offered only conclusory statements in support of their assertion that their policies were the least restrictive manner to achieve the compelling interest (institutional security). The Eighth Circuit noted it was "not clear whether [prison officials] seriously considered any other alternatives . . " Accordingly, further fact finding was required.

---

[15] The definition of "religious exercise" is more broad under RLUIPA than under a constitutional inquiry because it includes *any* exercise of religion, whether or not compelled by or central to a system of religious belief. See 42 U.S.C. § 2000cc-5(7)(A); Cutter, 544 U.S. at 715, 125 S.Ct. at 2118; Lovelace v. Lee, 472 F.3d 174, 187, n. 2 (4th Cir. 2006). Schnitzler's substantial burden argument is even stronger, therefore, under his RLUIPA claim than his constitutional claim.

[16] In light of the Supreme Court's statements in McKune that the State's interest in sex offender treatment programs are "undeniable" and "vital" it is accepted for purposes of this Opinion that the interest is "compelling."

19

There is insufficient evidence on this record to determine that the current form of the STOP program is the least restrictive means to further the compelling interest of reducing recidivism for Schnitzler. The affidavits submitted by Dooley, Reisch, Storgaard and Peterson refer to Schnitzler's proposed modified sex offender treatment plan in conclusory fashion, and provide no real basis for their conclusion that it would be ineffective in preventing recidivism--especially in light of Schnitzler's repeated expressions of his desire to comply with a treatment program which includes admission of his crime, but does not offend his religion. Additionally, it is impossible to determine whether an alternative program was "seriously considered." A genuine issue a fact remains, therefore, regarding whether the unmodified STOP program is the least restrictive means available to the South Dakota DOC to prevent recidivism by Schnitzler.

## CONCLUSION

Plaintiff has standing to pursue his claim, and it is ripe for decision. Genuine issues of material fact remain regarding whether the South Dakota DOC's policy requiring Schnitzler to participate in the unmodified STOP program despite his religious objections bears a reasonable relationship to a valid penological interest for First Amendment free exercise purposes, and whether it is the least restrictive means to further a compelling interest for purposes of RLUIPA, 42 U.S.C. § 2000cc et. seq. It is therefore RECOMMENDED to the District Court that Defendants' Motion for Summary Judgment (Doc. 25) and Plaintiff's Motion to Dismiss (Doc. 44) be DENIED.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this 22nd day of February, 2007.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, CLERK

By: _____, Deputy